Craig A. Miller (SB# 116030)
  cmiller@millercalhoonlaw.com
Patrick A. Calhoon (SB# 249149)
  pcalhoon@millercalhoonlaw.com
MILLER & CALHOON
225 Broadway, Suite 1310
San Diego, CA 92101
Telephone: (619) 231-9449
Facsimile:  (619) 231-8638

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE DIVISION)

| | |
|---|---|
| MICHAEL TAPIA, SR. | CASE NO. |
| Plaintiff, | COMPLAINT FOR:<br>(1) BREACH OF CONTRACT; AND<br>(2) BREACH OF THE IMPLIED |
| v. | COVENANT OF GOOD FAITH AND |
| AMERICAN HERITAGE LIFE<br>INSURANCE COMPANY; and DOES 1<br>through 10, | FAIR DEALING<br><br>__DEMAND FOR JURY TRIAL__ |
| Defendants. | |

Plaintiff, Michael Tapia, Sr., hereby alleges as follows:

<u>DEMAND FOR JURY TRIAL</u>

1.    Plaintiff hereby demands a trial by jury.

<u>PARTIES</u>

2.    Plaintiff Michael Tapia, Sr. ("Tapia") is, and at all times herein mentioned was, a resident of Santa Cruz County, State of California.

3.    Defendant American Heritage Life Insurance Company (hereinafter "American Heritage") has its principal place of business in the State of Florida and is incorporated under the laws of that State. American Heritage is registered to do business and does business in the State of California.

COMPLAINT

4.    The true names and capacities of defendants sued herein as DOES 1 through 10, inclusive, are presently unknown to Plaintiff, who therefore sues these defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously-named defendants is responsible in some manner for the conduct alleged herein and for the damages suffered by Plaintiff.

5.    At all times herein mentioned, each and every defendant was an agent and/or employee of each and every other defendant. In doing the things alleged in the causes of action stated herein, each and every defendant was acting within the course and scope of this agency or employment and was acting with the consent, permission and authorization of each of the remaining defendants. All actions of each defendant as alleged in the causes of action stated herein were ratified, approved or engaged in by every other defendant or their officers, directors and/or managing agents.

## JURISDICTION AND VENUE

6.    As the amount in controversy exceeds $75,000.00 and there is a diversity of the parties, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper in this District based upon plaintiff's residence and defendants' commercial activities.

## FACTUAL BACKGROUND

7.    On or about January 1, 2007 American Heritage issued to Tapia a Cancer and Specified Disease policy, Certificate No. W3126802. The Policy was established or maintained by the City of San Jose, California for the city's employees and is therefore a governmental plan pursuant to 29 U.S.C. § 1002(32).

8.    The Policy provides an initial benefit of $5,000 and lifetime cash "benefits for the necessary treatment of cancer or a specified disease, and for any other condition directly caused or aggravated by the cancer or specified disease", pursuant to the terms and conditions of the Policy. (A true and correct copy of the Certificate is attached hereto as Exhibit "A.")

9.    At all pertinent times, the premiums for the policy were paid as required

2

COMPLAINT

1    under the Policy, and the Policy was in full force and effect.

2         10.    Tapia has performed in a timely manner all conditions and covenants to be

3    performed under the Policy.

4         11.    Tapia is now 53 years old and served his community as a firefighter for the

5    city of San Jose for 27 years. In or about March 2016, Tapia ceased working as a firefighter

6    with city of San Jose. Tapia is a disabled person due to, among other things, his cancer,

7    and has been determined to be a disabled person by the city of San Jose.

8         12.    In or about March 16, 2016, Tapia was diagnosed with Essential

9    Thrombocythemia ("ET"). ET is recognized and classified by the World Health

10   Organization, the Leukemia & Lymphoma Society, and individual physicians, as a type of

11   blood cancer. It is one of four myeloproliferative neoplasms (blood cancers that occur

12   when the body makes too many white or red blood cells, or platelets). ET is a chronic

13   blood cancer caused by the clonal mutation of the stem cells responsible for producing all

14   blood cells, and specifically, the abnormal growth and proliferation of those malignant

15   blood cells throughout an individual's bone marrow resulting in, among other conditions,

16   the dangerous and potentially deadly overproduction of platelets.

17        13.    On or about September 7, 2016, Tapia timely made a claim for cancer

18   benefits under the Policy. On September 16, 2016, without conducting any investigation,

19   American Heritage sent an explanation of benefits stating that Tapia's condition was not

20   covered under the policy.

21        14.    On or about October 23, 2016, Tapia appealed the decision and provided a

22   letter from Tapia's physician, Peter Galatin, M.D., which explained that American

23   Heritage's claim denial "flies in the face of currently established medical opinion." Dr.

24   Galatin's letter explained that ET is a form of blood cancer and that Tapia's blood testing

25   identified a "clonal mutation" which makes it "particularly clear that he has a blood

26   cancer."

27        15.    American Heritage refused to change its coverage decision and instead

28   requested medical records from Tapia's physician, Peter Galatin, M.D. However,

3

1  American Heritage repeatedly used non-HIPPA compliant request forms or otherwise

2  failed to follow normal protocol for requesting records, resulting in a needless and

3  substantial delay in investigating the claim and obtaining Tapia's records. Due to its own

4  incompetence, American Heritage did not obtain Tapia's medical records until January

5  24, 2017.

6       16.   On March 1, 2017, American Heritage again formally denied coverage to

7  Tapia. In the denial letter, American Heritage referred to the policy definition of "cancer"

8  which states:

9       Cancer. The disease manifested by the presence of a malignancy
         characterized by the uncontrolled and abnormal growth and spread of
10      malignant cells in any part of the body. This includes: Hodgkin's Disease;
         leukemia; lymphoma; carcinoma; sarcoma; or malignant tumor. It does not
11      include other conditions that may be considered precancerous, such as:
         leukoplakia; actinic keratosis; carcinoid; hyperplasia; polycythemia;
12      nonmalignant melanoma; moles; or similar diseases or lesions.

13  The letter concluded that, "the condition Thrombocythemia does not meet the criteria for

14  cancer as defined in the policy."

15      17.   In approximately March or April 2017, Tapia again appealed the denial and

16  demanded that American Heritage have its physician contact Tapia's physician, Peter

17  Galatin, M.D. However, no substantive questioning or reasonable investigation took place

18  during the phone call between American Heritage's physician and Dr. Galatan. In fact,

19  American Heritage's physician asked only a single question, "do you stand by your

20  position regarding Mr. Tapia's condition?" When Dr. Galatan responded in the

21  affirmative, American Heritage's physician stated there were no other questions and ended

22  the phone call.

23      18.   Not surprisingly, American Heritage upheld its denial by letter of June 1,

24  2017 which states: "The recommendation of our Independent Physician is as follows, 'The

25  newly submitted information does not support a diagnosis of cancer as defined by the

26  policy'". The letter also states:

27      The policy definition specifically excludes polycythemia, which is a
         myeloproliferative neoplasm like essential thrombocytosis. Furthermore, the
28      policy definition requires the presence of abnormal growth and spread to

4

other parts of the body in the fashion a malignant tumor such as breast cancer can. While it is characterized by uncontrolled growth it is not characterized by abnormal spread of malignant cells to any part of the body and therefore does not meet the specific policy definition in this case.

19.     American Heritage's claims handling and coverage decision displays a willful and intentional effort to, inter-alia,  employ an unduly restrictive and/or inaccurate interpretation of the policy language in order to deny Tapia the  lifetime cash benefits to which he is entitled. In addition, and among other things, American Heritage failed to conduct a reasonable investigation into Tapia's ET to determine that the condition is covered under the policy, ignored definitive evidence proving that Tapia's condition is covered under the policy, misrepresented the nature of Tapia's cancer, misrepresented the definition of "cancer", and intentionally and knowingly relied on false or biased medical opinion. American Heritage made the decision to deny Tapia's claim even though it knew, or could have easily discovered, that ET is covered under the policy.

<u>FIRST CAUSE OF ACTION</u>

**PLAINTIFF, FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT AMERICAN HERITAGE AND DOES 1 THROUGH 10, INCLUSIVE, FOR BREACH OF CONTRACT, ALLEGES:**

20.     Plaintiff refers to and incorporates by reference herein, paragraphs 1 through 19, as though set forth in full in this cause of action.

21.     Under the Policy, American Heritage is obligated to pay, inter-alia,  an initial benefit of $5,000 and lifetime cash "benefits for the necessary treatment of cancer or a specified disease, and for any other condition directly caused or aggravated by the cancer or specified disease."

22.     Tapia demanded that American Heritage pay the Cancer and Specified Disease benefits, American Heritage refused to do so, and therefore breached its contractual obligations to Tapia.

23.     Since on or before September 16, 2016, American Heritage breached and continues to breach its contractual obligations owed to Tapia by denying his claim and refusing to make benefit payments.

COMPLAINT

1    24.    As a proximate result of the aforementioned breach of contract by the

2    defendant, Tapia has suffered, and will continue to suffer in the future, damages, plus

3    interest, for a total amount to be shown at the time of trial.

4                                   <u>SECOND CAUSE OF ACTION</u>

5
6    **PLAINTIFF, FOR A SECOND CAUSE OF ACTION AGAINST
     DEFENDANT AMERICAN HERITAGE AND DOES 1 THROUGH 10,
     INCLUSIVE, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
7    AND FAIR DEALING, ALLEGES:**

8    25.    Tapia refers to and incorporates by reference herein, paragraphs 1 through

9    24, as though set forth in full in this cause of action.

10    26.    American Heritage owed Tapia a duty of good faith and fair dealing with

11    respect to all transactions and relationships arising under the Policy. This duty included

12    the duty to refrain from engaging in any act which would interfere with Tapia' enjoyment

13    of the intended benefits of the Policy.

14    27.    American Heritage breached its duty of good faith and fair dealing owed to

15    Tapia in at least the following respects:

16           (a)    Unreasonably and/or intentionally failing to conclude that Tapia is

17    entitled to an initial benefit of $5,000 and lifetime cash "benefits for the necessary

18    treatment of cancer or a specified disease, and for any other condition directly caused or

19    aggravated by the cancer or specified disease" at a time when American Heritage knew that

20    Tapia was entitled to said payments under the terms of the Policy. Specifically, Tapia

21    submitted comprehensive information substantiating that he suffers from cancer under the

22    terms of the policy. American Heritage willfully refused to objectively evaluate the

23    information or accord it the consideration which it rightfully deserved and denied his

24    claim;

25           (b)    Unreasonably and/or intentionally failing to agree that Tapia suffered

26    from cancer and withholding benefits from Tapia knowing the claim under the policy to be

27    valid in that Tapia submitted adequate documentation and proof of his cancer from his

28    physician, thus entitling him to payments under the terms of the insurance policy;

COMPLAINT

1    (c)  Unreasonably and/or intentionally failing to pay Tapia Cancer and

2 Specified Disease benefits pursuant to his claim at a time when American Heritage had

3 sufficient information within its possession to justify said action;

4    (d)  Unreasonably and/or intentionally interpreting the evidence

5 and policy language in a manner calculated to deny benefits due to Tapia under the policy;

6    (e)  Unreasonably and/or intentionally failing to conduct a prompt,

7 objective, reasonable and/or thorough investigation of Tapia's claim for benefits;

8    (f)  Unreasonably and/or intentionally refusing to pay insurance

9 benefits knowing such insurance benefits were due and owing;

10    (g)  Unreasonably and/or intentionally failing to provide a reasonable

11 and/or honest explanation of the basis relied upon in the insurance policy, in relation to

12 the applicable facts, for the denial of Tapia's claim for benefits; and

13    (h)  Unreasonably and/or intentionally engaging in an unduly restrictive

14 and/or inaccurate interpretation of the policy language in order to avoid its obligations

15 thereunder.

16  28.  Plaintiff is informed and believe and thereon alleges that American Heritage

17 has, as a company pattern and practice, denied like claims based on these same false and

18 fraudulent grounds, and therefore has engaged in unfair business practices in the State of

19 California.  Tapia will seek leave of court to amend this complaint when he obtains

20 discovery from American Heritage supporting these other wrongful acts.

21  29.  Plaintiff is informed and believes and thereon alleges that American Heritage

22 has breached its duty of good faith and fair dealing owned to Tapia by other acts and

23 omissions of which Tapia is presently unaware. Tapia will seek leave of court to amend the

24 complaint at such time as Tapia discovers the other acts or omissions of said defendant

25 constituting such breach.

26  30.  As a proximate result of American Heritage's wrongful and tortious conduct

27 as set forth above, Tapia has suffered, and will continue to suffer in the future, damages

28 covered under the Policy plus interest, for a total amount to be shown at the time of trial.

COMPLAINT

31.     As a further proximate result of the wrongful and tortious conduct of American Heritage as set forth above, Tapia has incurred incidental damages and out-of-pocket expenses, including attorneys' fees, all to its damage in sums to be determined at the time of trial.

32.     As a proximate result of American Heritage's wrongful and tortious conduct as set forth above, Tapia has suffered severe anxiety and emotional distress damages, for a total amount to be shown at the time of trial.

33.     In doing the acts described herein, defendant's conduct was done with a conscious disregard of Tapia's rights so as to constitute oppression, fraud or malice as defined under California Civil Code Section 3294, entitling Tapia to punitive damages in an amount appropriate to punish or set an example of defendant. Defendant sacrificed Tapia's interests for its own financial gain.

34.     Tapia is a disabled person pursuant to California Civil Code § 1761(g). In doing the acts described herein, defendant's conduct was an unfair or deceptive practice against a disabled person under California Civil Code § 3345, entitling Tapia to three times that of the punitive damages award.

## PRAYER FOR RELIEF

WHEREFORE, Tapia prays for judgment and relief against defendants as applicable to each cause of action as follows:

1.     Damages for failure to provide benefits under the Cancer and Specified Disease insurance policy in a sum to be determined at the time of trial;

2.     General damages for mental and emotional distress and other incidental damages in a sum to be determined at the time of trial;

3.     Punitive and exemplary damages in an amount appropriate to punish or set an example of defendant;

4.     Treble damages pursuant to California Civil Code § 3345;

5.     Attorneys' fees and costs incurred to obtain insurance benefits;

6.     For prejudgment interest;

COMPLAINT

1   7.   For costs of suit incurred herein; and

2   8.   For such other and further relief as the Court deems just and proper.

3

4   Dated:  March 1, 2018                    MILLER & CALHOON

5

6                              By___/s/   Patrick A. Calhoon_____
                                    Craig A. Miller
7                                   Patrick A. Calhoon
                                    Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

EXHIBIT A



**AMERICAN HERITAGE LIFE INSURANCE COMPANY**
HOME OFFICE:
**1776 AMERICAN HERITAGE LIFE DRIVE**
**JACKSONVILLE, FLORIDA 32224-6688**
**(904) 992-1776**

**A Stock Company**

A STOCK COMPANY

(called "we", "our", "us" or "Company")

## CERTIFICATE OF INSURANCE

This certificate explains the policy of insurance underwritten by us.  It is not the contract of insurance.  The group policy (called the "policy"), as issued to the policyholder by us, alone makes up the agreement under which insurance coverage is provided and benefits are determined.  The policy may be inspected at the office of the policyholder during normal business hours.

### CONSIDERATION

Your coverage under the policy is issued to you in consideration of your enrollment form or other form of application and the payment of the first premium.  Your coverage under the policy is effective from 12:01 a.m. Standard Time on your effective date.

### INSURING CLAUSE

We certify coverage under the policy is in effect for persons: (a) who are eligible to become covered persons; and (b) who are in fact covered persons; and (c) for whom the required premium has been paid when due.  All such coverage is subject to the terms of the policy.

### NOTICE OF THIRTY (30) DAY RIGHT TO EXAMINE CERTIFICATE

You may, within 30 days after receipt of this certificate, return it to us or to our agent.  Upon such return of the certificate, it will be void as of the effective date; any premium paid will be refunded.

In this certificate the insured certificate holder will be referred to as "you", "your" or "yours".

This certificate supersedes and replaces any certificate previously issued to you under the policy.

**THIS IS LIMITED BENEFIT CANCER AND SPECIFIED DISEASE COVERAGE**
**WHICH ONLY PROVIDES BENEFITS FOR CANCER**
**AND SPECIFIED DISEASES AS DEFINED OR**
**OTHER OPTIONAL BENEFITS**
**DESCRIBED HEREIN**

2400055W31268202021160826WPL01057069

GVCC2



**EXHIBIT A-01**

## TABLE OF CONTENTS

**CERTIFICATE SPECIFICATIONS** .................................................................................. 3

**BENEFITS/AMOUNT** .............................................................................................. 3A

**GENERAL PROVISIONS**
COVERAGE SUBJECT TO POLICY .................................................................. 4
ELIGIBILITY OF FAMILY MEMBERS ............................................................. 4
ELIGIBILITY DATE ....................................................................................... 4
WHEN YOU CAN ENROLL OR DISCONTINUE YOUR COVERAGE ................. 4
WHEN EVIDENCE OF INSURABILITY IS REQUIRED ...................................... 5
CERTIFICATE OF COVERAGE ....................................................................... 5
EFFECTIVE DATE OF COVERAGE ................................................................. 5
ABSENT FROM WORK ON THE DATE COVERAGE WOULD NORMALLY BEGIN ........ 5
TERMINATION OF COVERAGE ...................................................................... 5
AGENCY ....................................................................................................... 5
CONVERSION PRIVILEGE ............................................................................. 6
GRACE PERIOD ........................................................................................... 6
ENTIRE CONTRACT ..................................................................................... 6
CONTESTABILITY ......................................................................................... 6
CLERICAL ERROR ......................................................................................... 6
LEGAL ACTION ............................................................................................ 6

**LIMITATIONS/EXCEPTIONS** ...................................................................... 7

**BENEFITS INFORMATION**
PAYMENT OF BENEFITS ............................................................................... 8
SCHEDULE OF BENEFITS ............................................................................ 8-11
OPTIONAL BENEFIT(S) ................................................................................ 11A
SCHEDULE OF SURGICAL PROCEDURES .................................................... 12-14

**CONTINUITY OF COVERAGE** ..................................................................... 15

**CLAIMS INFORMATION**
NOTICE OF CLAIM ....................................................................................... 16
CLAIM FORMS ............................................................................................. 16
FILING A CLAIM .......................................................................................... 16
PROOF OF YOUR CLAIM ............................................................................. 16
PHYSICAL EXAMINATION AND AUTOPSY ................................................... 16
PAYMENT OF CLAIMS ................................................................................. 16
ASSIGNMENT .............................................................................................. 16
OVERPAID CLAIM ........................................................................................ 17
CLAIM REVIEW ............................................................................................ 17
APPEALS PROCEDURE ................................................................................. 17

**GLOSSARY** ............................................................................................. 18-20

EXHIBIT A-02

# AMERICAN HERITAGE LIFE INSURANCE COMPANY
1776 American Heritage Life Drive, Jacksonville Florida 32224

DUPLICATE                    **CERTIFICATE SPECIFICATIONS**                    **DUPLICATE**

| FORM NO. | DESCRIPTION OF BENEFITS | NUMBER OF YEARS PAYABLE | PREMIUMS ANNUAL AMOUNT |
|---|---|---|---|
| GVCC2 | CANCER AND SPECIFIED DISEASE COVERAGE | LIFE** | $347.11 |
| | CANCER INITIAL DIAGNOSIS BENEFIT $5,000.00 | LIFE** | $88.90 |
| | INTENSIVE CARE UNIT BENEFIT        $800.00 | LIFE** | $97.76 |
| | CANCER SCREENING BENEFIT | LIFE** | $77.33 |
| |   MAMMOGRAPHY              SEE PAGE 11A | | |
| |   CERVICAL CANCER          SEE PAGE 11A | | |
| |   MISCELLANEOUS SCREENING  SEE PAGE 11A | | |
| | | TOTAL | $611.10 |

**SUBJECT TO TERMINATION OF COVERAGE PROVISION

FAMILY COVERAGE

The effective date and issue age of each benefit is the Effective Date and Issue Age of the Certificate unless otherwise specified.

**TOTAL PREMIUMS**

The Total Premiums include the charge for any additional benefits.     **DUPLICATE**

| ANNUAL | SEMI-ANNUAL | QUARTERLY | MONTHLY | BILLABLE PREMIUM |
|---|---|---|---|---|
| $611.10 | $317.78 | $161.94 | $55.00 | $55.00 |

Premium Payment Method     PRE-AUTHORIZED CHECK  -  MONTHLY

INSURED:  MICHAEL TAPIA                    ISSUE AGE:  42

EFFECTIVE DATE:  JANUARY 01, 2007          CERTIFICATE NUMBER:  W3126802

GROUP POLICY NUMBER:

FORM: GVCC2          CANCER COVERAGE  (P1)



**EXHIBIT A-03**

CANCER CERTIFICATE NUMBER:  W3126802

CANCER CERTIFICATE – GVCC2

SEE BENEFITS SECTION OF CERTIFICATE FOR DETAILS OF BENEFITS

------------------------------------------------------------------------

| BENEFITS | AMOUNT |
| --- | --- |
| -------------------- | -------------------- |
| A. CONTINUOUS HOSPITAL CONFINEMENT | |
|     DAYS 1-70 | $300.00/DAY |
| B. EXTENDED BENEFITS | |
|     DAYS 71+ | UP TO $300.00/DAY |
| C. GOVERNMENT OR CHARITY HOSPITAL | $300.00/DAY |
| D. PRIVATE DUTY NURSING SERVICES | UP TO $300.00/DAY |
| E. EXTENDED CARE FACILITY | UP TO $300.00/DAY |
| F. AT HOME NURSING | UP TO $300.00/DAY |
| G. HOSPICE CARE | |
|     1. FREESTANDING HOSPICE CARE CENTER | UP TO $300.00/DAY |
|     2. HOSPICE CARE TEAM | UP TO $300.00/VISIT |
| H. RADIATION/CHEMOTHERAPY | UP TO $10,000.00/12 MONTHS |
| I. BLOOD, PLASMA, AND PLATELETS | UP TO $10,000.00/12 MONTHS |
| J. SURGERY | UP TO $1,500.00 PER UNIT OF COVERAGE |
| | SEE SCHEDULE OF SURGICAL PROCEDURES |
| | 3.00 UNITS OF COVERAGE |
| K. ANESTHESIA | UP TO 25% OF SURGERY BENEFIT |
| L. BONE MARROW OR STEM CELL TRANSPLANT | |
|     1. AUTOLOGOUS TRANSPLANT | UP TO $1,500.00/12 MONTHS |
|     2. NON-AUTOLOGOUS TRANSPLANT | UP TO $3,750.00/12 MONTHS |
|     3. NON-AUTOLOGOUS TRANSPLANT FOR | |
|       THE TREATMENT OF LEUKEMIA | UP TO $7,500.00/12 MONTHS |
| M. AMBULATORY SURGICAL CENTER | UP TO $750.00/DAY |
| N. SECOND SURGICAL OPINION | UP TO $600.00 |
| O. INPATIENT DRUGS AND MEDICINE | UP TO $25.00/DAY |
| P. PHYSICIAN'S ATTENDANCE | UP TO $50.00/DAY |
| Q. AMBULANCE | UP TO $100.00/CONFINEMENT |
| R. NON-LOCAL TRANSPORTATION | COACH FARE OR $0.40/MILE |
| S. OUTPATIENT LODGING | UP TO $50.00/DAY |
| | UP TO $2,000.00/12 MONTHS |
| T. FAMILY MEMBER LODGING | UP TO $50.00/DAY |
|   AND TRANSPORTATION | COACH FARE OR $0.40/MILE |
| U. PHYSICAL OR SPEECH THERAPY | UP TO $50.00/DAY |
| V. NEW OR EXPERIMENTAL TREATMENT | UP TO $5,000.00/12 MONTHS |
| W. PROSTHESIS | UP TO $2,000.00/AMPUTATION |
| X. COMFORT/ANTI-NAUSEA | UP TO $200.00/YEAR |
| Y. WAIVER OF PREMIUM | AFTER 90 DAYS |

FORM: GVCC2                                                      PAGE 3A



**EXHIBIT A-04**

## GENERAL PROVISIONS

**COVERAGE SUBJECT TO POLICY**
The coverage described in this certificate is subject in every way to the terms of the policy that is issued to the policyholder. It alone makes up the agreement by which the insurance is provided. The group policy may at any time be amended or discontinued by agreement between us and the policyholder. Your consent is not required for this. Neither are we required to give you prior notice.

**ELIGIBILITY OF FAMILY MEMBERS**
Family members eligible to be covered persons are:
1. you; and
2. your spouse on the effective date; and
3. unmarried children of you or your spouse, including adopted children, children during pendency of adoption procedures and stepchildren, who are under 22 years old or under 26 years old and full-time students at an educational institution of higher learning beyond high school.

A child born to you or your covered spouse, while this policy is in force as a family policy, will be a covered person. This coverage begins at the moment of birth of such child for benefits otherwise payable to a covered person under this policy. Any person who becomes a family member after the effective date (except newborns) must be added by endorsement. No additional premium will be required for newborns or family members added by endorsement if this policy is in force as a family policy.

Under individual coverage, newborn children are automatically covered from the moment of birth for a period of 31 days. If you desire uninterrupted coverage for the newborn child (children), you must notify us within 31 days of the child's birth. Upon notification, we will convert your coverage to family coverage and advise you of the additional premium due. If you have individual coverage and you marry and desire coverage for your spouse, you must notify us of your marriage within 31 days of the marriage and we will convert your coverage to family coverage and advise you of the additional premium due.

The provisions of this section also apply to adopted children and children during pendency of adoption proceedings as follows:

1. Coverage is retroactive from the moment of birth for a child with respect to whom a decree of adoption by you has been entered within 31 days after the date of birth.
2. If adoption proceedings have been instituted by you within 31 days after the date of birth and you have temporary custody, coverage must be provided from the moment of birth.
3. For children other than newborns, if adoption proceedings have been completed, and a decree of adoption was entered within 1 year from the institution of the proceedings, coverage will begin upon temporary custody for 1 year, unless extended by the order of the court by reasons of the special needs of the child.

Coverage must be provided as long as you have custody of the child pursuant to decree of the court and required premiums are paid.

**ELIGIBILITY DATE**
The date you are eligible for coverage is the later of:
1. the policy effective date; or
2. the date you become a member of the eligible class.

**WHEN YOU CAN ENROLL OR DISCONTINUE YOUR COVERAGE**
1. You may apply for coverage during:
   a) your initial enrollment period; or
   b) at any other time, subject to evidence of insurability.
2. You may discontinue your coverage at any time.



**EXHIBIT A-05**

## GENERAL PROVISIONS (CONT)

**WHEN EVIDENCE OF INSURABILITY IS REQUIRED**

Evidence of Insurability is required if you:

1. voluntarily canceled your coverage and are reapplying; or
2. are applying for coverage at any time after your initial enrollment period.

**CERTIFICATE OF COVERAGE**

We will issue certificates of coverage to the policyholder for delivery to you. This certificate provides a description of the group policy and states:

1. the benefits provided under the group policy; and
2. to whom benefits are payable; and
3. the limitations, exclusions and requirements that apply to the coverage under the policy.

If there is any discrepancy between the provisions of this certificate and the provisions of the policy, the provisions of the policy govern.

**EFFECTIVE DATE OF COVERAGE**

Your coverage will be effective on the effective date shown on page 3 of your certificate.

For any change in coverage that is not subject to evidence of insurability, the change in coverage is effective on the date we receive such request for change in coverage.

For any change in coverage that is subject to evidence of insurability the change in coverage is effective on the date we approve such change.

**ABSENT FROM WORK ON THE DATE COVERAGE WOULD NORMALLY BEGIN**

If you are absent from work due to injury, sickness, temporary layoff or leave of absence, your coverage will begin on the date you return to active employment. This applies to your initial coverage, as well as any increase or additions to coverage that occurs after your initial coverage is effective.

**TERMINATION OF COVERAGE**

Your coverage under the policy ends on the earliest of:

1. the date the policy is canceled; or
2. the last day of the period for which you made any required premium payments; or
3. the last day you are in active employment; or
4. the date you are no longer in an eligible class; or
5. the date your class is no longer eligible.

We will provide coverage for a payable claim that occurs while you are covered under the policy.

If your spouse is a covered person, your spouse's coverage ends upon valid decree of divorce or your death.

If the child is a covered person, the child's coverage ends on the policy anniversary next following the date the child is no longer eligible. This is the earlier of: (a) when the child marries; or (b) reaches age 22 (26 if a full-time student attending an educational institution of higher learning beyond high school). Coverage does not terminate on an unmarried child who:

1. is incapable of self-sustaining employment by reason of mental or physical incapacity; and
2. became so incapacitated prior to the attainment of the limiting age of eligibility under this policy; and
3. is chiefly dependent upon you for support and maintenance.

Dependent coverage continues as long as this policy remains in force and the dependent remains in such condition. Proof of the incapacity and dependency of the child must be furnished within 60 days of the child's attainment of the limiting age of eligibility. Thereafter, such proof must be furnished as frequently as may be required, but no more frequently than annually after the child's attainment of the limiting age for eligibility.

If we accept a premium for coverage extending beyond the date, age or event specified for termination as to a covered person, then coverage continues during the period for which such premium was accepted. This does not apply where such acceptance was based on a misstatement of age.

**AGENCY**

For purposes of the policy, the employer acts on its own behalf or as your agent. Under no circumstances will the employer be deemed the agent of American Heritage Life.

## GENERAL PROVISIONS (CONT)

**CONVERSION PRIVILEGE**

If your coverage terminates for reasons other than non-payment of premium, or if coverage of a spouse covered under this policy terminates due to divorce or your death, or if coverage of a covered child terminates due to the child becoming married or reaching age 22 (26 if a full-time student), such covered person can obtain a policy of insurance (called the converted policy), without evidence of insurability.  Obtaining that policy is subject to the following conditions:

1.  Application for the converted policy must be made to us within 31 days (within 60 days of final divorce decree in case of divorce) after the coverage terminates.  The effective date of the converted policy will be the date on which this coverage terminates.
2.  The converted policy premium is at the rate for the class of risk at the applicant's age for insurance provided as of the date of the conversion.
3.  Any conditions excluded in this coverage are excluded in the converted policy.  No other pre-existing conditions are excluded.  The Pre-Existing Condition Limitation and Contestability provisions are waived to the extent that such periods have been met under this coverage.  Benefits payable to the applicant under the converted policy are reduced by benefits payable under this coverage.
4.  The converted policy will be a similar policy or a policy providing lesser benefits at the applicant's option.

When conversion is due to divorce, other dependents covered under this coverage may be covered under such new policy or under this coverage as you and your former spouse may elect.  They may not be covered under both.

If either this coverage or a new policy is in force on you or your former spouse, and either of you re-marry, such new spouse may be covered under the appropriate policy.  We must be advised of the re-marriage by the completion of a new application for such new spouse.  This new application is subject to our approval.  You or your former spouse must pay the premiums appropriate to such new policy in order to have it issued and maintained in force.

**GRACE PERIOD**

The policyholder is entitled to a grace period of 31 days for the payment of any premium due except for the first premium.  The policy continues in force during the grace period, unless the policyholder gives us written notice of discontinuance in advance of the date of discontinuance and in accordance with the terms of the policy.  The policyholder is liable to us for the payment of any pro rata premium for the time the policy is in force during a grace period.

**ENTIRE CONTRACT**

The contract consists of the following items:

1.  the group policy; and
2.  any amendments and endorsements; and
3.  the applications and other written statements of the policyholder; and
4.  any individual applications, enrollment forms, and evidences of insurability of the covered persons.

Any statements made by the policyholder or by a covered person, in the absence of fraud, are representations and not warranties.  Only written statements signed by the policyholder or the covered person will be used in defense of a claim.  A copy of any written statement, if applicable, will be furnished to the policyholder or the covered person or his beneficiary, if any, if a claim is denied based upon such a statement.

**CONTESTABILITY**

After 2 years from the effective date of the policy, no misstatement of the policyholder, made in any application(s), can be used to void the policy.  After two years from the effective date of any covered person's coverage, no misstatement of a covered person, made in writing, can be used to void coverage or deny a claim for loss incurred.

**CLERICAL ERROR**

Clerical error on the part of the policyholder or us will not invalidate insurance otherwise in force nor continue insurance otherwise terminated.  Upon discovery of any error, an adjustment will be made in the premiums.  Complete proof must be supplied by the policyholder documenting any clerical errors.

**LEGAL ACTION**

No legal action may be brought to obtain benefits under the policy:

1.  for at least 60 days after proof of loss has been furnished; or
2.  after the expiration of 3 years from the time written proof of loss is required to have been furnished.



2400055W312680202016082ExWPL01457073

**EXHIBIT A-07**

## LIMITATIONS/EXCEPTIONS

**A.    PRE-EXISTING CONDITION LIMITATION**

We do not pay for any loss due to a pre-existing condition as defined during the 12 month period beginning on the date that person became a covered person.

**B.   OTHER LIMITATIONS AND EXCEPTIONS**

We do not pay for any loss except for losses due directly from cancer or a specified disease and any other conditions or diseases caused or aggravated by cancer or a specified disease.  Diagnosis must be submitted to support each claim.


**(This space intentionally left blank.)**

EXHIBIT A-08

# BENEFITS INFORMATION

**PAYMENT OF BENEFITS**

If cancer or a specified disease is diagnosed on or after the covered person's effective date, we pay according to the Benefits provisions in this certificate, subject to the Limitations/Exceptions provision and all other provisions contained in this certificate.

If cancer or a specified disease is diagnosed while the covered person is hospital confined, benefits begin retroactively to the day of admission or 10 days prior to the date of diagnosis if this is more favorable.

If positive diagnosis is made for cancer or a specified disease within 12 months after a tentative diagnosis, benefits are paid from the date of tentative diagnosis if the tentative diagnosis is made on or after the effective date, subject to the Pre-existing Condition Limitation provision.

If a covered person dies while an inpatient in a hospital and cancer or a specified disease is not diagnosed until after the covered person's death, benefits will begin retroactively to the day of admission, up to a maximum of 30 days prior to death.

**SCHEDULE OF BENEFITS**

We pay the following benefits for the necessary treatment of cancer or a specified disease, and for any other condition directly caused or aggravated by the cancer or specified disease. Treatment must be received in the United States or its territories.

For those benefits for which we pay actual charges up to a specified maximum amount, except benefits H., I., L., V. and W., if specific charges are not obtainable as proof of loss, we will pay 50% of the applicable maximum for the benefit(s) payable.

No benefits are payable for the treatment of cancer or a specified disease except those expressly stated in this Schedule of Benefits.

A. **Continuous Hospital Confinement.** If a covered person is admitted to and confined as an inpatient in a hospital for the treatment of cancer or specified disease, we pay the amount shown on page 3A per day for each day. The maximum number of days payable is 70 days for each period of continuous hospital confinement.

B. **Extended Benefits.** If a covered person is confined in a hospital for the treatment of cancer or a specified disease for more than 70 days of continuous hospital confinement, we pay actual charges up to the amount shown on page 3A per day for: hospital room and board; medicine; laboratory tests; and other hospital charges. This benefit begins on the 71st day of continuous hospital confinement. This benefit is payable in lieu of all other benefits payable during the continuous hospital confinement beginning on the 71st day under the Schedule of Benefits (except the Waiver of Premium Benefit). This benefit continues as long as the covered person is continuously hospital confined.

C. **Government or Charity Hospital.** In lieu of all other benefits in this policy (except the Waiver of Premium Benefit), we pay the amount shown on page 3A per day for each day a covered person is confined to: 1) a hospital operated by or for the U.S. Government (including the Veteran's Administration); or 2) a hospital that does not charge for the services it provides (charity). The confinement must be for the treatment of cancer or a specified disease.

D. **Private Duty Nursing Services.** While a covered person is an inpatient receiving cancer or specified disease treatment, we pay the actual charges, up to the amount shown on page 3A per day if such covered person requires the full-time services of a private nurse. Full-time means at least 8 hours of attendance during a 24 hour period. These services must be required and authorized by a physician for cancer or specified disease treatment and must be provided by a nurse.

E. **Extended Care Facility.** We pay actual charges up to the amount shown on page 3A per day for each day a covered person is confined in an extended care facility for the treatment of cancer or specified disease. Confinement in the extended care facility must be at the direction of the attending physician and must begin within 14 days after a covered hospital confinement. This benefit is limited to the number of days of the previous continuous hospital confinement.

F. **At Home Nursing.** While a covered person is receiving treatment for cancer or specified disease, we pay actual charges up to the amount shown on page 3A per day for private nursing care and attendance by a nurse at home. At home nursing services must be required and authorized by the attending physician and must begin within 14 days after a covered confinement as an inpatient in a hospital. This benefit is limited to the number of days of the previous continuous hospital confinement.

2A00055W312688D0201608826WPL01557074



**EXHIBIT A-09**

# BENEFITS INFORMATION (CONT)

**G.  Hospice Care.**  When a covered person is:
1.  diagnosed with cancer or a specified disease; and
2.  determined by a physician to be terminally ill as a result of cancer or a specified disease; and
3.  expected to live 6 months or less;

we pay one of the following two benefits for hospice care:

(1)  ***Freestanding Hospice Care Center***. We pay actual charges up to the amount shown on page 3A per day for confinement in a licensed freestanding hospice care center.  The covered person must be diagnosed by a physician as terminally ill and the attending physician must approve the confinement.  This benefit is payable only if a covered person is admitted to a freestanding hospice care center within 14 days after a period of inpatient hospital confinement.  Benefits payable for hospice centers that are designated areas of hospitals will be paid the same as inpatient hospital confinement; or

(2)  ***Hospice Care Team***. We pay actual charges up to the amount shown on page 3A per visit, limited to 1 visit per day, for home care services by a hospice care team.  Home care services are hospice services provided in the patient's home.  This benefit is payable only if: the covered person has been diagnosed as terminally ill; and the attending physician has approved such services; and home care services begin within 14 days after a period of hospital confinement.  We do not pay for: food services or meals other than dietary counseling; or services related to well-baby care; or services provided by volunteers; or support for the family after the death of the covered person.

**H.  Radiation/Chemotherapy.**  We pay actual charges, up to the limit stated below for radiation therapy and chemotherapy received by a covered person as part of treatment for cancer or a specified disease.  This benefit is limited to the amount shown on page 3A per 12 month period beginning with the first day of benefit under this provision.  Administration of radiation therapy or chemotherapy other than by medical personnel in a physician's office or hospital, including medications dispensed by a pump, will be limited to the costs of the drugs only, subject to the maximum amount payable per 12 month period shown on page 3A.

We only pay this benefit for cancer or specified disease treatment consisting of:
1.  cancericidal chemical substances for the purpose of modification or destruction of cancer or specified disease; and
2.  X-ray radiation; and
3.  radium and cesium implants; and
4.  cobalt.

This benefit does not pay for:  treatment planning; or treatment consultation; or treatment management; or the design and construction of treatment devices; or basic radiation dosimetry calculation; or any type of laboratory tests; or X-ray or other imaging used for diagnosis or disease monitoring; or the diagnostic tests related to these treatments.  This benefit also does not pay for any devices or supplies including intravenous solutions and needles related to these treatments.

**I.  Blood, Plasma and Platelets.**  We pay actual charges, up to the limit stated below, for:
1.  blood, plasma and platelets (including transfusions and administration charges); and
2.  processing and procurement costs; and
3.  cross-matching;
received by a covered person in conjunction with cancer or specified disease treatment. This benefit is limited to the amount shown on page 3A per 12 month period beginning with the first day of benefit under this provision.  We do not pay for blood replaced by donors.

EXHIBIT A-10

## BENEFITS INFORMATION (CONT)

**J.  Surgery.**  When surgery is performed on a covered person:
1.  for the purpose of treating a diagnosed cancer or specified disease; or
2.  for the purpose of diagnosing cancer or specified disease and that surgery results in a diagnosis of cancer or specified disease; or
3.  that is the first surgery performed subsequent to a diagnosis of cancer or specified disease that is performed for the purpose of verifying the complete removal of the cancer or specified disease.

We pay the actual charges, up to the amount listed in the Schedule of Surgical Procedures for the specific procedure per unit of coverage shown on page 3A.  If any surgical procedure for the treatment or diagnosis of a cancer or specified disease other than those listed in the Schedule of Surgical Procedures is performed, we pay the actual charges, up to the unit value for the surgical procedure as set forth in the 1964 California Relative Value Schedule (C.R.V.S.) multiplied by $10.00 per unit of coverage.  If the surgical procedure has no unit value or is not shown in the 1964 C.R.V.S., we pay the actual charges, up to an amount we reasonably determine to be consistent (based upon relative difficulty) with the Schedule of Surgical Procedures per unit of coverage.  Two or more procedures performed at the same time through one incision or entry point are considered one operation; we pay the amount for the procedure with the greatest benefit.  Payment will never exceed the maximum per unit of coverage.  Surgery performed on an outpatient basis is paid at 150% of the scheduled benefit.  This benefit does not pay for surgeries covered by other benefits in this Schedule of Benefits.

**K.  Anesthesia.**  We pay actual charges of an anesthetist not to exceed 25% of the amount paid for the Surgery Benefit (benefit J.) for anesthesia received.

**L.  Bone Marrow or Stem Cell Transplant.**  We pay the amounts shown on page 3A for the following types of bone marrow or stem cell transplants performed on a covered person for cancer or specified disease treatment:
1.  A transplant which is other than non-autologous.
2.  A transplant which is non-autologous for the treatment of cancer or specified disease other than leukemia.
3.  A transplant which is non-autologous for the treatment of leukemia.

This benefit is payable only once per covered person per calendar year.

**M.  Ambulatory Surgical Center.**  We pay the actual charges for the use of an ambulatory surgical center, up to the amount shown on page 3A for a surgical procedure covered under the Surgery Benefit (benefit J.) that is performed at an ambulatory surgical center.

**N.  Second Surgical Opinion.**  If surgery is recommended by a physician due to the diagnosis of cancer or specified disease and the covered person chooses to obtain the opinion of a second physician, we pay the actual charges for the second opinion, up to the amount shown on page 3A.  This second opinion must be: rendered prior to surgery being performed; and obtained from a physician not in practice with the physician rendering the original recommendation.

**O.  Inpatient Drugs and Medicine.**  We pay actual charges made by the hospital for drugs and medicine, related to cancer or specified disease treatment, while hospital confined up to the amount shown on page 3A per day, for each day of continuous hospital confinement.  This benefit does not pay for drugs and/or medicine covered under the Radiation/Chemotherapy Benefit (benefit H).

**P.  Physician's Attendance.**  We pay actual charges for a visit by a physician while a covered person is receiving cancer or specified disease treatment during hospital confinement up to the amount shown on page 3A per day.  This benefit is limited to one visit by one physician per day of hospital confinement.  A visit means personal attendance by the physician.  Admission to the hospital as an inpatient is required.

**Q.  Ambulance.**  We pay actual charges up to the amount shown on page 3A per continuous hospital confinement for transportation by a licensed ambulance service or a hospital owned ambulance to or from a hospital in which the covered person is confined for cancer or specified disease treatment.

2400055W312688020201608260WPL01657075



**EXHIBIT A-11**

## BENEFITS INFORMATION (CONT)

**R.** **Non-Local Transportation.** We pay the following benefit for cancer or specified disease treatment at a hospital (inpatient or outpatient); or radiation therapy center; or chemotherapy or oncology clinic; or any other specialized freestanding treatment center nearest to the covered person's home, provided the same or similar treatment cannot be obtained locally: 1. actual cost of round trip coach fare on a common carrier; or the amount shown on page 3A, up to 700 miles, for round trip personal vehicle transportation. Mileage is measured from the covered person's home to the nearest treatment facility as described above. "Non-Local" means a round trip of more than 70 miles from the covered person's home to the nearest treatment facility. We do not pay for: transportation for someone to accompany or visit the person receiving treatment; visits to a physician's office or clinic; or for services other than actual treatment.

**S.** **Outpatient Lodging.** We pay a daily lodging benefit when a covered person receives radiation or chemotherapy treatment for cancer or specified disease (benefit H.) on an outpatient basis, provided the specific treatment is authorized by the attending physician and cannot be obtained locally. The benefit is the actual cost of a single room in a motel, hotel, or other accommodations acceptable to us, up to the amount shown on page 3A per day during treatment. This benefit is limited to the amount shown on page 3A per 12 month period beginning with the first day of benefit under this provision. Outpatient treatment must be received at a treatment facility more than 100 miles from the covered person's home.

**T.** **Family Member Lodging and Transportation.** We pay the following benefits for one adult member of the covered person's family to be near the covered person, when a covered person is confined in a non-local hospital for specialized treatment for cancer or specified disease:
1. *Lodging*-The actual cost of a single room in a motel, hotel, or other accommodations acceptable to us, up to the amount shown on page 3A per day. This benefit is limited to 60 days for each period of continuous hospital confinement; and
2. *Transportation*-The actual cost of round trip coach fare on a common carrier or a personal vehicle allowance of the amount shown on page 3A per mile, up to 700 miles per continuous hospital confinement. Mileage is measured from the visiting family member's home to the hospital where the covered person is confined. We do not pay the Family Member Transportation Benefit if the personal vehicle transportation benefit is paid under the Non-Local Transportation Benefit (benefit R.), when the family member lives in the same city or town as the covered person.

**U.** **Physical or Speech Therapy.** We pay actual charges up to the amount shown on page 3A per day, for physical or speech therapy for restoration of normal body function.

**V.** **New or Experimental Treatment.** We pay actual charges, up to the limit stated below, for new or experimental treatment for cancer or specified disease when:
1. the treatment is judged necessary by the attending physician; and
2. no other generally accepted treatment produces superior results in the opinion of the attending physician.

This benefit is limited to the amount shown on page 3A per 12 month period beginning with the first day of treatment under this provision. This benefit does not pay if benefits are payable for treatment covered under any other benefit in this Schedule of Benefits.

**W.** **Prosthesis.** We pay actual charges up to the amount shown on page 3A for prosthetic devices which are prescribed as a direct result of surgery for cancer or specified disease treatment and which require surgical implantation. This benefit is limited to the amount shown on page 3A per covered person, per amputation.

**X.** **Comfort/Anti-Nausea Benefit.** We pay the actual charges, up to the amount shown on page 3A per calendar year for anti-nausea medication prescribed for a covered person by a physician in conjunction with cancer or specified disease treatment. We will not pay this benefit for medication administered while the covered person is an inpatient.

**Y.** **Waiver of Premium.** If, while this coverage is in force, the employee becomes disabled due to cancer first diagnosed after the effective date of coverage and remains disabled for 90 days, we pay premiums due after such 90 days for as long as the insured remains disabled. The term "disabled" means that you are:
1. unable to work at any job for which the employee is qualified by education, training or experience; and
2. not working at any job for pay or benefits; and
3. under the care of a physician for the treatment of cancer.

## OPTIONAL BENEFIT(S)

**Cancer Initial Diagnosis.**  We pay a one-time benefit when a covered person is diagnosed for the first time as having cancer other than skin cancer.  The first diagnosis must occur after the effective date of coverage for that covered person.  The benefit is the amount shown on page 3.  The benefit is payable only once per covered person.


## (This space intentionally left blank.)



**EXHIBIT A-13**

## OPTIONAL BENEFIT(S)

**Intensive Care Unit.**

**A.   Confinement.**  We pay the amount shown on page 3 for each day of continuous hospital intensive care unit confinement in a hospital intensive care unit for up to 45 days for each period of such confinement.  A day is a 24 hour period.  If confinement is for only a portion of a day, then a pro-rata share of the daily benefit is paid.  We do not pay for intensive care if a covered person is admitted because of:

1.   an attempted suicide; or
2.   intentional self-inflicted injury; or
3.   intoxication or being under the influence of drugs not prescribed or recommended by a physician; or
4.   alcoholism or drug addiction.

We do not pay for confinements in any care unit that does not qualify as a hospital intensive care unit.  Progressive care units, sub-acute intensive care units, intermediate care units, and private rooms with monitoring, step down units and any other lesser care treatment units do not qualify as hospital intensive care units.

We do not pay this benefit for continuous hospital intensive care unit confinements that occur during a hospitalization that begins before the effective date of coverage.

Children born within 10 months of the effective date are not covered for any continuous hospital intensive care unit confinement that occurs or begins during the first 30 days of such child's life.

**B.   Ambulance.**  We pay the actual charges, for transportation of a covered person by licensed air or surface ambulance service to a hospital for admission to an intensive care unit for a covered confinement.  We do not pay this benefit if an ambulance benefit is paid under the Ambulance Benefit (benefit Q.) in the Schedule of Benefits.

## (This space intentionally left blank.)





GVCC2

**EXHIBIT A-14**

# SCREENING BENEFITS

I.   **Mammography Benefit.**  We pay the greater of the actual charges or $70 for a covered person as follows:  a) baseline mammography for women ages 35 to 39, inclusive; and b) mammography every 2 years, or more frequently upon physician's recommendation for women ages 40 to 49, inclusive; and c) annual mammography for women ages 50 and older.

II.  **Cervical Cancer Screening Benefit.**  We pay the greater of the actual charges or $50 for an annual cervical cancer screening test.  This benefit is limited to one test per covered person, per calendar year.

III. **Miscellaneous Screening Benefit**.  We pay this benefit if a covered person has one of the following cancer screening tests performed.  We pay $50 per calendar year, per covered person, for any one of the following cancer screening tests.  We pay this benefit regardless of the result of the test.

The eligible screening tests under this benefit are:

A.   Bone marrow testing; and
B.   CA15-3 (cancer antigen 15-3 - blood test for breast cancer); and
C.   CA125 (cancer antigen 125 - blood test for ovarian cancer); and
D.   CEA (carcinoembryonic antigen - blood test for colon cancer); and
E.   Chest X-ray; and
F.   Colonoscopy; and
G.   Flexible sigmoidoscopy; and
H.   Hemocult stool analysis; and
I.   PSA (prostate specific antigen - blood test for prostate cancer); and
J.   Serum Protein Electrophoresis (test for myeloma).

2A0005W31268B20201608826WPL01957078



**EXHIBIT A-15**

# SCHEDULE OF SURGICAL PROCEDURES
## PER UNIT OF SURGERY COVERAGE

| SURGICAL PROCEDURE | PROCEDURE CODE FOR 1964 C.R.V.S | UNIT OF SURGERY COVERAGE |
|---|---|---|

**BRAIN**

| | | |
|---|---|---|
| Craniectomy, trephination, bone flap craniotomy; for excision of brain tumor, supratentorial, except meningioma | 61510 | $1,250.00 |
| Craniectomy, trephination, bone flap craniotomy; for excision of meningioma, supratentorial | 61512 | $1,500.00 |
| Transoral approach to skull base, brain stem or upper spinal cord for biopsy, decompression or excision of lesion | 61575 | $1,250.00 |
| Stereotactic biopsy, aspiration, or excision, including burr hole(s), for intracranial lesion; with computerized axial tomography | 61751 | $1,400.00 |

**BREAST**

| | | |
|---|---|---|
| Biopsy of breast; needle core (separate procedure) | 19100 | $ 25.00 |
| Biopsy of breast; incisional | 19101 | $ 150.00 |
| Excision of malignant tumor (except 19140), male or female, one or more lesions | 19120 | $ 150.00 |
| Mastectomy, partial | 19160 | $ 150.00 |
| Mastectomy, simple, complete | 19180 | $ 300.00 |
| Mastectomy, modified radical, including axillary lymph nodes, with or without pectoralis minor muscle, but excluding pectoralis major muscle | 19240 | $ 600.00 |

**DIGESTIVE SYSTEM**

| | | |
|---|---|---|
| Upper gastrointestinal endoscopy including esophagus, stomach, and either the duodenum and/or jejunum as appropriate; diagnostic, with collection of specimen(s) by brushing or washing (separate procedure) | 43235 | $ 150.00 |
| Gastrectomy, total; with esophagoenterostomy | 43620 | $1,000.00 |
| Colectomy, partial; with anastomosis | 44140 | $ 800.00 |
| Proctectomy; complete, combined abdominoperineal, with colostomy, one or two stages | 45110 | $1,000.00 |
| Colonoscopy, flexible, proximal to splenic flexure; diagnostic, with collection of specimen(s) by brushing or washing, with or without colon decompression (separate procedure) | 45378 | $ 280.00 |
| Colonoscopy, flexible, proximal to splenic flexure; with removal of tumor(s), polyp(s), or other lesion(s) by snare technique | 45385 | $ 500.00 |

**EXTERNAL GENITALIA**
**FEMALE**

| | | |
|---|---|---|
| Vulvectomy, simple; partial | 56620 | $ 400.00 |
| Vulvectomy, simple; complete | 56625 | $ 550.00 |
| Vulvectomy, radical, partial | 56630 | $ 800.00 |
| Vulvectomy, radical, complete, with inguinofemoral, iliac, and pelvic lymphadenectomy | 56640 | $1,000.00 |

2400055W312688202021608826WPL02057079



**EXHIBIT A-16**

## SCHEDULE OF SURGICAL PROCEDURES (CONT)
## PER UNIT OF SURGERY COVERAGE

| SURGICAL PROCEDURE | PROCEDURE CODE FOR 1964 C.R.V.S | UNIT OF SURGERY COVERAGE |
|---|---|---|
| **EXTERNAL GENITALIA (cont)** | | |
| **MALE** | | |
| Biopsy of testis, needle (separate procedure) | 54500 | $   20.00 |
| Orchiectomy, radical, for tumor; inguinal approach | 54530 | $ 400.00 |
| **LIVER** | | |
| Biopsy of liver; percutaneous needle | 47000 | $   50.00 |
| Biopsy of liver, wedge (separate procedure) | 47100 | $ 400.00 |
| Hepatectomy, resection of liver; partial lobectomy | 47120 | $ 800.00 |
| **LUNG** | | |
| Bronchoscopy; with biopsy | 31625 | $ 200.00 |
| Biopsy, lung or mediastinum, percutaneous needle | 32405 | $   50.00 |
| Removal of lung, total pneumonectomy | 32440 | $1,000.00 |
| **MUSCULOSKELETAL** | | |
| Biopsy, bone, trocar or needle; superficial (e.g., ilium, sternum, spinous process, ribs) | 20220 | $   50.00 |
| Excision of tumor, soft tissue of neck or thorax; deep, subfascial, intramuscular | 21556 | $ 100.00 |
| Laminectomy for biopsy/excision of intraspinal neoplasm; extradural, cervical | 63275 | $1,000.00 |
| **PROSTATE** | | |
| Transurethral resection of prostate, including control of postoperative bleeding, complete (vasectomy, meatotomy, cystourethroscopy, urethral calibration and/or dilation, and internal urethrotomy are included) | 52601 | $ 800.00 |
| Prostatectomy, perineal, subtotal (including control of postoperative bleeding, vasectomy, meatotomy, urethral calibration and/or dilation, and internal urethrotomy) | 55801 | $ 800.00 |
| Prostatectomy, retropubic radical, with or without nerve sparing; with bilateral pelvic lymphaden-ectomy, including external iliac, hypogastric and obturator nodes | 55845 | $1,300.00 |
| **SKIN** | | |
| Biopsy of skin, subcutaneous tissue and/or mucous membrane (including simple closure), unless otherwise listed (separate procedure); single lesion (pathology report required) | 11100 | $   30.00 |
| Biopsy of skin, subcutaneous tissue and/or mucous membrane (including simple closure), unless otherwise listed (separate procedure); each separate/additional lesion (pathology report required) | 11101 | $   15.00 |

EXHIBIT A-17

## SCHEDULE OF SURGICAL PROCEDURES (CONT)
## PER UNIT OF SURGERY COVERAGE

| SURGICAL PROCEDURE | PROCEDURE CODE FOR 1964 C.R.V.S | UNIT OF SURGERY COVERAGE |
|---|---|---|

**SKIN (cont)**

Excision, malignant lesion, trunk, arms, or legs;
    lesion diameter 0.5 cm. or less............................ 11600 ............................. $ 60.00
Excision, malignant lesion, trunk, arms, or legs;
    lesion diameter 2.1 to 3.0 cm.............................. 11603 ............................. $ 120.00
Excision, malignant lesion, scalp, neck, hands,
    feet, genitalia; lesion diameter 0.5 cm. or less.................. 11620 ............................. $ 100.00
Excision, malignant lesion, scalp, neck, hands,
    feet, genitalia, lesion diameter 2.1 to 3.0 cm. ..................... 11623 ............................. $ 250.00
Excision, malignant lesion, face, ears, eyelids,
    nose, lips; lesion diameter 0.5 cm. or less........................ 11640 ............................. $ 150.00
Excision, malignant lesion, face, ears, eyelids,
    nose, lips; lesion diameter 2.1 to 3.0 cm. ........................... 11643 ............................. $ 300.00
Chemosurgery (Mohs' micrographic technique);
    first state, fresh tissue technique, including
    removal of all gross tumor, surgical excision of
    tissue specimens, mapping, color coding of
    specimens, and microscopic examination of
    specimens by the surgeon, of up to 5 specimens ............. 17304 ............................. $ 200.00

**UTERUS**

Colposcopy (vaginoscopy); with biopsy(s) of the
    cervix and/or endocervical curettage .................................. 57454 ............................. $ 60.00
Endometrial and/or endocervical sampling
    (biopsy), without cervical dilation, any method
    (separate procedure) .......................................................... 58100 ............................. $ 30.00
Dilation and curettage, diagnostic and/or
    therapeutic (nonobstetrical) ............................................... 58120 ............................. $ 150.00
Total abdominal hysterectomy (corpus and cervix),
    with or without removal of tube(s), with or without
    removal of ovary(s) ............................................................ 58150 ............................. $ 600.00
Radical abdominal hysterectomy, with bilateral
    total pelvic lymphadenectomy and para-aortic lymph
    node sampling (biopsy), with or without removal of
    tubes(s), with or without removal of ovary(s) .................... 58210 ............................. $1,000.00
Vaginal hysterectomy ................................................................ 58260 ............................. $ 600.00

**VASCULAR INJECTION PROCEDURE**

Placement of central venous catheter for therapeutic
    reasons (subclavian, jugular, or other vein) (e.g., for
    hyperalimentation, hemodialysis, or chemotherapy);
    percutaneous, over age 2................................................... 36489 ............................. $ 100.00
Insertion of implantable venous access port, with
    or without subcutaneous reservoir..................................... 36533 ............................. $ 400.00
Removal of implantable venous access port
    and/or subcutaneous reservoir ........................................... 36535 ............................. $ 150.00

2400055W312680202016082616WPL02157060



EXHIBIT A-18

## CONTINUITY OF COVERAGE

**IF YOU ARE NOT IN ACTIVE EMPLOYMENT WHEN YOUR EMPLOYER CHANGES GROUP INSURANCE CARRIERS TO AMERICAN HERITAGE LIFE**

When the plan becomes effective, we provide coverage for you if:
1. you are not in active employment due to sickness as a result of cancer; and
2. you were covered by the prior group policy when it terminated; and
3. the prior group policy provided cancer coverage.

Your coverage is subject to payment of premium.

Your benefit will be limited to the amount that would have been paid by the prior carrier.  We will reduce your benefits by any amount for which your prior carrier is liable.

**IF YOU HAVE A LOSS DUE TO A PRE-EXISTING CONDITION AND YOUR EMPLOYER CHANGES GROUP INSURANCE CARRIERS TO AMERICAN HERITAGE LIFE**

We may pay benefits if your loss results from a pre-existing condition if you were:
1. in active employment and insured under this plan on its effective date; and
2. insured by the prior group policy when it terminated.

The prior group policy's coverage must be substantially similar to this coverage and have been in effect within 60 days of this plan's effective date in order for this provision to apply.

In order to receive benefits you must satisfy the time limit in the Pre-existing Condition provision under:
1. our plan; or
2. the prior carrier's plan, if benefits would have been paid had that policy remained in force.

If you do not satisfy item 1 or 2 above, we will not pay any benefits.

If you satisfy either item 1 or item 2, we will determine our payments according to the American Heritage Life policy provisions.

## (This space intentionally left blank.)

EXHIBIT A-19

# CLAIMS INFORMATION

**NOTICE OF CLAIM**

We encourage the employee to notify us of claim as soon as possible so that a claim decision can be made in a timely manner. Written notice of claim must be given to us within 20 days after the occurrence or commencement of any loss covered by this policy, or as soon as is reasonably possible. Notice given by or on behalf of the employee or the beneficiary to us at 1776 American Heritage Life Drive, Jacksonville, Florida 32224-6688, or to any authorized agent of ours, with your name and certificate number, is notice to us.

**CLAIM FORMS**

The claim form is available from your employer, or you can request a claim form from us. If you do not receive the form from us within 15 days of your request, send us written proof of claim without waiting for the form.

**FILING A CLAIM**

You and your Employer must fill out your own sections of the claim form and then give it to your attending physician. Your physician should fill out his or her section of the form and send it directly to us.

**PROOF OF YOUR CLAIM**

If this certificate provides for periodic payment of a continuing loss, written proof of loss must be furnished to us within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given to us within 90 days after each loss. If it is not possible to give us written proof in the time required, we will not reduce or deny any claim for this reason, as long as the proof is filed as soon as reasonably possible. In any event, the proof required must be given to us no later than 1 year from the time specified unless the employees are legally incapacitated.

**PHYSICAL EXAMINATION AND AUTOPSY**

We have the right, at our own expense, to have any covered person examined by a physician of our choosing, as often as may be reasonably required while a claim is pending. We may have an autopsy performed during the period of contestability, where it is not forbidden by law. The autopsy must be performed in this state.

**PAYMENT OF CLAIMS**

After receiving written proof of loss, we pay all benefits then due under this certificate. Benefits for any other loss covered by this certificate are paid as soon as we receive proper written proof. We will make payments to you unless you assign such payments. Any amounts unpaid at your death may, at our option, be paid either to the named beneficiary or to your estate. If benefits are payable to your estate or a beneficiary who cannot execute a valid release, we can pay benefits up to $1,000, to someone related to you or your beneficiary by blood or marriage whom we consider to be entitled to the benefits. We will be discharged to the extent of any such payment made in good faith.

**ASSIGNMENT**

An assignment of the coverage under this certificate is not binding on us, unless:
1. it is a written request; and
2. it is received and recorded by us at our home office.

We are not responsible for the validity of any assignment. An assignment is subject to any payment we make or other action we take before we record the assignment. An assignment may not change the owner or beneficiary.



**EXHIBIT A-20**

## CLAIMS INFORMATION (CONT)

**OVERPAID CLAIM**

We have the right to recover any overpayments due to:
1.   fraud; or
2.   any error we make in processing a claim.

You must reimburse us in full.  We will work with you to develop a reasonable method of repayment if you are financially unable to repay us in a lump sum.

We will not recover more money than the amount you were paid.

**CLAIM REVIEW**

If a claim is denied, we will give written notice of:

1.   the reason for denial; and
2.   the policy provision that relates to the denial; and
3.   your right to ask for a review of your claim; and
4.   any additional information that might allow us to change our decision.

You may, upon written request, read any reports that are not confidential.  For a small fee, we will make copies of those reports for your use.

**APPEALS PROCEDURE**

Prior to filing any lawsuit and within 60 days after denial of a claim, you or your beneficiary must appeal any denial of benefits under the policy by making a written request for review of the denial.


# (This space intentionally left blank.)

# GLOSSARY

**Active Employment.**  Means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation.  You must be working at least the minimum number of hours as described under eligible class in each plan.

Your work site must be:
1.   your employer's usual place of business; or
2.   an alternative work site at the direction of your Employer; or
3.   a location to which your job requires you to travel.

Normal vacation is considered active employment.  Temporary and seasonal workers are excluded from coverage.

**Ambulatory Surgical Center.**  A licensed surgical center consisting of: an operating room; facilities for the administration of general anesthesia; and a post surgery recovery room that the patient is admitted to and discharged from within the same working day.  This includes an ambulatory surgical center that is a part of a hospital.

**Autologous Bone Marrow Transplant.**  A procedure in which bone marrow is removed from a patient, stored, and then given back to the patient following intensive treatment.

**Bone Marrow Transplant.**  A procedure to replace bone marrow destroyed by treatment with high doses of anticancer drugs or radiation.  A transplant may be autologous (the person's own marrow saved before treatment), allogeneic (marrow donated by someone else), or syngeneic (marrow donated by an identical twin).

**Cancer.**  The disease manifested by the presence of a malignancy characterized by the uncontrolled and abnormal growth and spread of malignant cells in any part of the body.  This includes: Hodgkin's Disease; leukemia; lymphoma; carcinoma; sarcoma; or malignant tumor.  It does not include other conditions that may be considered precancerous, such as: leukoplakia; actinic keratosis; carcinoid; hyperplasia; polycythemia; nonmalignant melanoma; moles; or similar diseases or lesions.

**Common Carrier.**  Only the following: commercial airlines; or passenger trains; or intercity buslines.  It does not include taxis; or intracity buslines; or private charter planes.

**Continuous Hospital Confinement.**  One continuous confinement or two or more hospital confinements not separated by more than 30 days.  If there are more than 30 days between confinements, they are considered separate confinements.

**Continuous Hospital Intensive Care Unit Confinement.**  One continuous confinement or two or more hospital intensive care unit confinements not separated by more than 30 days.  If there are more than 30 days between confinements, they are considered separate confinements.

**Covered Person.**  Any of the following:
1.   any eligible family member (including you) named in the enrollment form or evidence of insurability form and acceptable for coverage by us; or
2.   any eligible family member added after the effective date; or
3.   a newborn child.

**Date of Diagnosis.**  The earliest of the date of: tentative diagnosis; or clinical diagnosis; or the day the tissue specimen, culture(s) and/or titer(s) are taken, upon which the positive or tentative diagnosis of cancer or specified disease is made.

**Employee.**  Means a person who is a citizen or resident of the United States or Canada in active employment with the Employer.

**Employer.**  Means the individual, company or corporation where you are in active employment, and includes any division, subsidiary, or affiliated company named in the policy.

**Evidence of Insurability.**  Means a statement of your medical history which American Heritage Life will use to determine if you are approved for coverage.  Evidence of insurability will be provided at your own expense.

**Extended Care Facility.**  A licensed nursing facility under the direction of a physician which provides continuous skilled nursing service under the supervision of a graduate registered nurse (R.N.) and maintains daily medical records on each patient.  It does not include any institution, or part thereof, used primarily as a place for the aged, drug addicts, alcoholics, or rest.



**EXHIBIT A-22**

# GLOSSARY (CONT)

**Freestanding Hospice Care Center.** A center which is not a hospital, a wing, or section of a hospital, providing 24 hour a day care for the terminally ill under the medical direction of a physician.

**Grace Period.** Means the period of time following the premium due date during which premium payment may be made.

**Hospital.** A legally operated institution with established facilities (either on its premises or available to the hospital on a contractual, pre-arranged basis and under the supervision of a staff of one or more duly licensed physicians), for the care and treatment of sick and injured persons for diagnosis, surgery, and 24 hour nursing service. Hospital does not include:
1. any institution which is mainly a rest home, nursing home, convalescent home, or home for the aged; or
2. any institution which is mainly for the care and treatment of alcoholics or drug addicts, or mental or nervous disorders.

**Hospital Intensive Care Unit.** A hospital area of special care including cardiac or coronary care units, which at the time of admission is separate and apart from the surgical recovery room, other rooms, beds, or wards normally used for patient confinement. In addition the unit must provide the following:
1. 24 hour continuous nursing care attended by nurses assigned to the unit on a full time basis; and
2. direction and/or supervision by a full time physician director or a standing "intensive care" committee of the medical staff; and
3. special medical apparatus used to treat the critically ill.

**Initial Enrollment Period.** Means one of the following periods during which you may first apply in writing for coverage under this plan:
1. if you are eligible for coverage on the plan effective date, a period before the plan effective date as set by the employer; or
2. if you become eligible for coverage after the plan effective date, the period ending 31 days after the date you are first eligible to apply for coverage.

**Insured.** The person accepted for coverage by us who has completed and signed the enrollment form or evidence of insurability and whose name appears on the Certificate Specification Page.

**Intoxication.** A temporary state of being as determined by the laws of the state in which the loss occurred.

**Material And Substantial Duties.** Means duties that:
1. are normally required for the performance of your regular occupation; and
2. cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, we will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**Non-Autologous Bone Marrow Transplant.** Allogeneic or syngeneic graft of living bone marrow from one human being to another.

**Nurse.** Any one of the following who is not a member of the covered person's immediate family or employed by the hospital where the covered person is confined:
1. licensed practical nurse (L.P.N.); or
2. licensed vocational nurse (L.V.N.); or
3. graduate registered nurse (R.N.).

**Oncologist.** A legally licensed Doctor of Medicine certified to practice in the field of Oncology.

**Pathologist.** A legally licensed Doctor of Medicine certified by the American Board of Pathology to practice Pathological Anatomy.

**Payable Claim.** Means a claim for which American Heritage Life is liable under the terms of the policy.

**Physician.** Means:
1. a person performing tasks that are within the limits of his medical license; and
2. a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
3. a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

American Heritage Life will not recognize the employee, his spouse, children, parents, or siblings as a physician for a claim that he sends to us.

# GLOSSARY (CONT)

**Plan.** Means a line of coverage under the policy.

**Policyholder.** Means the Employer to whom the policy is issued.

**Positive Diagnosis (of cancer).** A diagnosis by a licensed doctor of medicine certified by the American Board of Pathology to practice Pathological Anatomy, or an Osteopathic Pathologist. Diagnosis is based on a microscopic examination of fixed tissue, or preparations from the hemic system (except for skin cancer). We accept clinical diagnosis of cancer as evidence that cancer existed in a covered person when a pathological diagnosis cannot be made, provided medical evidence substantially documents the diagnosis and the covered person received definitive treatment for the cancer.

**Positive Diagnosis (of a specified disease).** A diagnosis by a qualified physician based on generally accepted diagnostic procedures and criteria.

**Pre-Existing Condition.** A disease or physical condition for which medical advice or treatment was received by the covered person during the 12 month period prior to the effective date of the covered person's coverage.

**Radiologist.** One who is licensed to administer X-ray therapy, radium therapy, or radio-active isotopes therapy and is certified by the American Board of Radiology.

**Re-Enrollment Period.** Means a period of time as set by your employer and us during which you may apply, in writing, for coverage under this plan, or change your coverage under this plan if you are currently enrolled.

**Specified Disease.** Only any one of the following:

(1) Amyotrophic Lateral Sclerosis (Lou Gehrig's Disease)
(2) Muscular Dystrophy
(3) Poliomyelitis
(4) Multiple Sclerosis
(5) Encephalitis
(6) Rabies
(7) Tetanus
(8) Tuberculosis
(9) Osteomyelitis
(10) Diphtheria
(11) Scarlet Fever
(12) Cerebrospinal Meningitis (bacterial)
(13) Brucellosis
(14) Sickle Cell Anemia
(15) Thallasemia
(16) Rocky Mountain Spotted Fever
(17) Legionnaire's Disease (confirmation by culture or sputum)
(18) Addison's Disease
(19) Hansen's Disease
(20) Tularemia
(21) Hepatitis (Chronic B or Chronic C with liver failure or hepatoma)
(22) Typhoid Fever
(23) Myasthenia Gravis
(24) Reye's Syndrome
(25) Primary Sclerosing Cholangitis (Walter Payton's Liver Disease)
(26) Lyme Disease
(27) Systemic Lupus Erythematosus
(28) Cystic Fibrosis
(29) Primary Biliary Cirrhosis

**Stem Cell Transplant.** A method of replacing immature blood and bone marrow cells that were destroyed by cancer treatment. The stem cells are given to the person after treatment to help the bone marrow recover and continue producing healthy blood cells.

**Temporary Layoff** or **Leave of Absence.** Means you are absent from active employment for a period of time that has been agreed to in advance in writing by your Employer.

Your normal vacation time or any period of disability is not considered a temporary layoff or leave of absence.

**Tentative Diagnosis.** A tentative diagnosis is established based upon dated medical records which indicate a diagnosis of a probable or possible cancer or specified disease.

**We, Us**, and **Our.** Means American Heritage Life Insurance Company.

**You.** Means a person who is eligible for American Heritage Life coverage.

2400055W3126820220160826WPL02457083



**EXHIBIT A-24**

# AMERICAN HERITAGE LIFE INSURANCE COMPANY
**Jacksonville, Florida 32224-6688**

### <u>AMENDMENT</u>

The following is added to the General Provisions of the policy/certificate to which it is attached:

> **Cooperation of Beneficiary.**   The beneficiary must reasonably cooperate during any investigation and/or adjudication of a claim.   This includes the authorization for the release of medical records and other information.

This Amendment does not change, alter, or amend the policy/certificate except as stated.

This Amendment becomes effective as of the policy/certificate date.



Secretary

2A00055W312680202016082G6WPL02557084

CBA1

**EXHIBIT A-25**



**AMERICAN HERITAGE LIFE INSURANCE COMPANY**
HOME OFFICE:
1776 AMERICAN HERITAGE LIFE DRIVE
JACKSONVILLE, FLORIDA 32224-6688
(904) 992-1776

A Stock Company

**THIS IS LIMITED BENEFIT SPECIFIED DISEASE COVERAGE WHICH ONLY PROVIDES BENEFITS FOR CANCER AND SPECIFIED DISEASES AS DEFINED OR OTHER OPTIONAL BENEFITS DESCRIBED HEREIN**

# CUSTOMER

# INFORMATION

# SECTION

1000055W31268202201608206WPL0257061

**CUSTSEC**

**Policy Number** 55W3126802

# CONTINUATION COVERAGE RIGHTS UNDER COBRA

## Introduction

You are receiving this notice because you have recently become covered under a group health plan (the Plan).  This notice contains important information about your right to COBRA continuation coverage, which is a temporary extension of coverage under the Plan.  **This notice generally explains COBRA continuation coverage, when it may become available to you and your family, and what you need to do to protect the right to receive it.**

The right to COBRA continuation coverage was created by a federal law, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).  COBRA continuation coverage can become available to you when you would otherwise lose your group health coverage.  It can also become available to other members of your family who are covered under the Plan when they would otherwise lose their group health coverage.  For additional information about your rights and obligations under the Plan and under federal law, you should review the Plan's Summary Plan Description or contact the Plan Administrator.

## What is COBRA Continuation Coverage?

COBRA continuation coverage is a continuation of Plan coverage when coverage would otherwise end because of a life event known as a "qualifying event". Specific qualifying events are listed later in this notice.  After a qualifying event, COBRA continuation coverage must be offered to each person who is a "qualified beneficiary". You, your spouse, and your dependent children could become qualified beneficiaries if coverage under the Plan is lost because of the qualifying event.  Under the Plan, qualified beneficiaries who elect COBRA continuation coverage must pay for COBRA continuation coverage.

If you are an employee, you will become a qualified beneficiary if you lose your coverage under the Plan because either one of the following qualifying events happens:

- Your hours of employment are reduced, or
- Your employment ends for any reason other than your gross misconduct.

If you are the spouse of an employee, you will become a qualified beneficiary if you lose your coverage under the Plan because any of the following qualifying events happens:

- Your spouse dies;
- Your spouse's hours of employment are reduced;
- Your spouse's employment ends for any reason other than his or her gross misconduct;
- Your spouse becomes entitled to Medicare benefits (under Part A, Part B, or both); or
- You become divorced or legally separated from your spouse.

Your dependent children will become qualified beneficiaries if they lose coverage under the Plan because any of the following qualifying events happens:

- The parent-employee dies;
- The parent-employee's hours of employment are reduced;
- The parent-employee's employment ends for any reason other than his or her gross misconduct;
- The parent-employee becomes entitled to Medicare benefits (Part A, Part B, or both);
- The parents become divorced or legally separated; or
- The child stops being eligible for coverage under the plan as a "dependent child".

Sometimes, filing a proceeding in bankruptcy under title 11 of the United States Code can be a qualifying event.  If a proceeding in bankruptcy is filed with respect to the Employer named at the end of this notice and that bankruptcy results in the loss of coverage of any retired employee covered under the Plan, the retired employee will become a qualified beneficiary with respect to the bankruptcy.  The retired employee's spouse, surviving spouse, and dependent children will also become qualified beneficiaries if bankruptcy results in the loss of their coverage under the Plan.



**EXHIBIT A-28**

## CONTINUATION COVERAGE RIGHTS UNDER COBRA (Continued)

<u>**When is COBRA Coverage Available?**</u>

The Plan will offer COBRA continuation coverage to qualified beneficiaries only after the Plan Administrator has been notified that a qualifying event has occurred.  When the qualifying event is the end of employment or reduction of hours of employment, death of the employee, commencement of a proceeding in bankruptcy with respect to the employer, or the employee's becoming entitled to Medicare benefits (under Part A, Part B, or both), the employer must notify the Plan Administrator of the qualifying event.

<u>**You Must Give Notice of Some Qualifying Events**</u>

**For the other qualifying events (<u>divorce</u> or <u>legal separation</u> of the employee and spouse or a <u>dependent child's losing eligibility for coverage</u> as a dependent child), you must notify the Plan Administrator within 60 days after the qualifying event occurs.  You must provide this notice to the Employer named at the end of this notice.**

<u>**How is COBRA Coverage Provided?**</u>

Once the Plan Administrator receives notice that a qualifying event has occurred, COBRA continuation coverage will be offered to each of the qualified beneficiaries.  Each qualified beneficiary will have an independent right to elect COBRA continuation coverage.  Covered employees may elect COBRA continuation coverage on behalf of their spouses, and parents may elect COBRA continuation coverage on behalf of their children.

COBRA continuation coverage is a temporary continuation of coverage.  When the qualifying event is the death of the employee, the employee's becoming entitled to Medicare benefits (under Part A, Part B, or both), your divorce or legal separation, or a dependent child's losing eligibility as a dependent child, COBRA continuation coverage lasts for up to a total of 36 months.  When the qualifying event is the end of employment or reduction of the employee's hours of employment, and the employee became entitled to Medicare benefits less than 18 months before the qualifying event, COBRA continuation coverage for qualified beneficiaries other than the employee lasts until 36 months after the date of Medicare entitlement.  For example, if a covered employee becomes entitled to Medicare 8 months before the date on which his employment terminates, COBRA continuation coverage for his spouse and children can last up to 36 months after the date of Medicare entitlement, which is equal to 28 months after the date of the qualifying event (36 months minus 8 months).  Otherwise, when the qualifying event is the end of employment or reduction of the employee's hours of employment, COBRA continuation coverage generally lasts for only up to a total of 18 months.  There are two ways in which this 18-month period of COBRA continuation coverage can be extended:

1. ***Disability extension of 18-month period of continuation coverage***

   If you or anyone in your family covered under the Plan is determined by the Social Security Administration to be disabled and you notify the Plan Administrator in a timely fashion, you and your entire family may be entitled to receive up to an additional 11 months of COBRA continuation coverage, for a total maximum of 29 months.  The disability would have to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of continuation coverage.

2. ***Second qualifying event extension of 18-month period of continuation coverage***

   If your family experiences another qualifying event while receiving 18 months of COBRA continuation coverage, the spouse and dependent children in your family can get up to 18 additional months of COBRA continuation coverage, for a maximum of 36 months, if notice of the second qualifying event is properly given to the Plan.  This extension may be available to the spouse and any dependent children receiving continuation coverage if the employee or former employee dies, becomes entitled to Medicare benefits (under Part A, Part B, or both), or gets divorced or legally separated, or if the dependent child stops being eligible under the Plan as a dependent child, but only if the event would have caused the spouse or dependent child to lose coverage under the Plan had the first qualifying event not occurred.

## CONTINUATION COVERAGE RIGHTS UNDER COBRA (Continued)

**If You Have Questions**

Questions concerning your Plan or your COBRA continuation coverage rights should be addressed to the contact identified below.   For more information about your rights under ERISA, including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), and other laws affecting group health plans, contact the nearest Regional or District Office of the U.S.   Department of Labor's Employee Benefits Security Administration (EBSA) in your area or visit the EBSA website at www.dol.gov/ebsa.  (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.)

**Keep Your Plan Informed of Address Changes**

In order to protect your family's rights, you should keep the Plan Administrator informed of any changes in the addresses of family members.   You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

**Plan Contact Information**

**Name, Address and**
**Telephone Number**
**Of Policyholder:**

1000055W31268020201160826WPL00457063

COBRA                                                                                                    02/05



**EXHIBIT A-30**



# NOTICE OF PRIVACY PRACTICES

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION.  PLEASE REVIEW IT CAREFULLY.**

## <u>EFFECTIVE APRIL 14, 2003</u>

We are required by the privacy regulations issued under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to maintain the privacy of our Plan's customers' Protected Health Information,  to provide those customers with notice of our legal duties and privacy practices with respect to Protected Health Information, and to send notification to affected customers if there is a breach of unsecured Protected Health Information.   If your state provides privacy protections that are more stringent than those provided by HIPAA, we will maintain your Protected Health Information in accordance with the more stringent state standard.

This Notice applies to "Protected Health Information" associated with "Health Plans" issued by American Heritage Life Insurance Company.

This Notice describes how we may use and disclose Protected Health Information to perform claims handling, payment, general insurance operations, and for other purposes that are permitted or required by law.  Use or disclosure of your Protected Health Information for the purposes described in this Notice may be made in writing, orally, or by electronic means.

We are required to abide by the terms of this Notice.   However, we may change the terms of this Notice at any time.   If we change this Notice, we may make the new notice terms effective for all of your Protected Health Information that we maintain, including any information we created or received prior to issuing the new notice.  If we make a material revision to our Privacy Notice, copies will be sent to you if you are then currently insured under our Plan.

Protected Health Information means information about you that is created or received by us and during the administration of coverage under the Plan, which identifies you or for which there is a reasonable basis to believe the information can be used to identify you and that relates to:

> 1)      the past, present or future physical or mental health condition of the individual; or
> 2)      the provision of health care to the individual; or
> 3)      the past, present or future payment for the provision of health care to the individual.

### Uses  and Disclosures of Protected Health Information With Your Written Authorization

Except as described in the next section of this Notice, we will not use or disclose your Protected Health Information for any purpose unless you have signed a form authorizing the use or disclosure.  For example, most uses and disclosures of psychotherapy notes, uses and disclosures of Protected Health Information for marketing purposes, and disclosures that constitute a sale of Protected Health Information will be made only with your authorization.  You have the right to revoke that authorization in writing at any

1000055W312688202021608260WPL00557064



**EXHIBIT A-31**

time,  except to the extent that we have already taken action in reliance on the authorization; or the authorization was obtained as a condition of obtaining coverage, to the extent that other law allows the insurer to contest a claim under the policy or the policy itself.

### Uses and Disclosures of Protected Health Information Without Your Written Authorization

**For Payment**. We may make use of and disclose your Protected Health Information without your written authorization as may be necessary for payment purposes.  For example, we may use information regarding your medical procedures and treatment to process and pay claims or certify these services are covered under your Plan.

**For Plan Administrative Operations**. We may make use of and disclose your Protected Health Information without your written authorization as necessary for our Plan administrative operations.  Plan administrative operations include our usual business activities, examples of which are management, licensing, peer review, quality improvement and assurance, enrollment, underwriting, reinsurance, compliance, auditing, rating, claims handling, complaint handling and other functions related to your Plan. We are prohibited from using or disclosing genetic information for underwriting purposes.

**To Individuals Involved In Your Care**.  We may, without your written authorization, for the purposes of treatment, payment or Plan administrative operations, disclose the fact that you are covered under a Plan or that payment has been processed to a family member, other relative, your close personal friend or any other person you may identify.  In these circumstances, we would not disclose any Protected Health Information which is not directly relevant to that person's involvement with your care or with payment for your care.

If you have designated a person to receive information regarding payment of the premium or pay premium via credit card, we may inform that person or credit card facility when your premium has not been paid or received by us.

We may also disclose limited Protected Health Information to a public or private entity that is authorized to assist in disaster relief efforts in order for that entity to locate a family member or other persons that may be involved in some aspect of caring for you.

**To Our Business Associates**. Certain aspects and components of our services are performed through contracts with outside persons or organizations.  Examples of these may include, but are not limited to our duly appointed insurance agents, financial auditors, reinsurers, legal services, enrollment and billing services, claim payment and medical management services.  We may provide access to your Protected Health Information without your written authorization to one or more of these outside persons or organizations who assist us with payment or Plan administrative operations.  We require these business associates to appropriately safeguard the privacy of your information.

**To Plan Sponsors.**  If you are enrolled in a group health plan, we may share summary health information with your employer, union, or other employee organization that sponsors and maintains the group health plan, for purposes of obtaining premium bids; or modifying, amending, or terminating the group health plan; or enrollment and disenrollment information. Summary health information excludes genetic information.

**For Other Products and Services**. We may contact you without your written authorization to provide information regarding Plan upgrades or additional benefits that may be of interest to you. For example, we may use the fact that you currently are insured under a Plan for the purpose of communicating to you about changes to our Plan or products that could enhance or add value to existing coverage.

**For Disclosure With Authorization.**   Unless otherwise excluded in this notice, we will not disclose any other Protected Health Information to any person or entity not specifically mentioned elsewhere in this Notice without your express written authorization.

**For Other Uses and Disclosures**. We are permitted or required by law to make some other uses and disclosures of your Protected Health Information without your authorization.  We may release your Protected Health Information:

- if required by law to a government authorized health oversight agency or company conducting audits, investigations, or civil or criminal proceedings.

- if required to do so by a court or administrative ordered subpoena or discovery request.  In most cases you will have notice of such a release.

- for public health activities, such as required reporting of disease, injury, birth and death and for required public health investigations.

- as required by law if we suspect child abuse or neglect or if we believe you to be a victim of abuse, neglect or domestic violence.

- to the Food and Drug Administration if necessary to report adverse events, product defects or to participate in product recalls.

- to law enforcement officials as required by law to report wounds, injuries or crimes.

- to coroners, medical examiners and/or funeral directors consistent with law.

- for a national security or intelligence activity or, if you are a member of the military, as required by the armed forces.

- to workers' compensation agencies or similar programs, established by law, that provide benefits for work-related injuries or illness without regard to fault.

<b>Your Rights</b>

**Right to Inspect and Copy Your Protected Health Information**. You may have access to our records that contain your Protected Health Information in order to inspect and obtain copies of the records.  Under limited circumstances, we may deny you access to a portion of your records.  If you desire access to your records, please obtain a record request form from our Privacy Officer and submit the completed form to our Privacy Office.  If you request copies, we may charge you copying and mailing costs.   If you request a copy of your Protected Health Information in electronic form, we will provide it to you electronically only if the record is readily producible in electronic form.

**Right to Amend Your Protected Health Information**. You have the right to request that we amend your Protected Health Information maintained in our enrollment, payment, claims adjudication and case or medical management records, or other records we use to make decisions about you.  If you desire to amend these records, please obtain an amendment request form from our Privacy Officer and submit the completed form to our Privacy Office.  We will comply with your request unless special circumstances apply.  If your physician or other health care provider created the information that you desire to amend, you should contact the provider to amend the information.

**Right to an Accounting of the Disclosures of Your Protected Health Information**. Upon request, you may obtain an accounting of certain disclosures of your Protected Health Information made by us on or after April 14, 2003, excluding disclosures made earlier than six years before the date of your request. If you request an accounting more than once during any 12 month period, we will charge you a reasonable fee for the subsequent accounting statements.

**Right to Request Confidential Communications.** We will accommodate your reasonable request to receive communications of your Protected Health Information from us by alternative means of communication or at alternative locations if the request clearly states that disclosure of that information could endanger you.

HIPNAHL1                                        3                          Revised: August 2013

1000055W31268820201608260WPL00657065



**EXHIBIT A-33**

**Right to Request Restrictions on Use and Disclosure of Your Protected Health Information**. You have the right to request restrictions on some of our uses and disclosures of your Protected Health Information to family members and others involved in your care or payment for care; or some of our uses and disclosures used to carry out treatment, payment, or Plan administrative operations, by notifying us of your request for a restriction in writing mailed to the contact identified at the end of this Notice. Your request must describe in detail the restriction you are requesting. We are not required to agree to your restriction request but will attempt to accommodate your requests.  We retain the right to terminate an agreed-to restriction. In the event of a termination of an agreed-to restriction by us, we will notify you of such termination, but the termination will only be effective for Protected Health Information we receive after we have notified you of the termination.  You also have the right to terminate any agreed-to restriction by contacting us using the "Contact Information" provided at the end of this Notice.

**Personal Representatives.**  You may exercise your rights through a personal representative who will be required to produce evidence of his or her authority to act on your behalf.  Proof of authority may be made by a notarized power of attorney, a court order of appointment of the person as your legal guardian or conservator, or if you are the parent of a minor child.  We reserve the right to deny access to your personal representative.

**Right to Receive Paper Copy of this Notice.**  You may obtain a copy of this Notice.  You may obtain a paper copy of this Notice even if you agreed to receive such notice electronically.  Please contact us and we will mail it to you.

## Complaints

If you believe your privacy rights have been violated, you can file a complaint with the Plan or with the Secretary of the U.S. Department of Health and Human Services. To file a complaint with the Plan, send it in writing to the "Contact Information" at the address listed at the end of this Notice. There will be no retaliation for filing a complaint.

You may obtain a copy of this Notice by writing to us at the contact address below.

## Contact Information

If you have questions or need further assistance regarding this Notice, you may contact:

Allstate Benefits
Attn: HIPAA Privacy Officer
1776 American Heritage Life Drive
Jacksonville, Florida 32224

Or, you may telephone the Customer Care Center at 1-800-521-3535.

EXHIBIT A-34



## Allstate.
### Benefits

*Important Privacy Policy Notice*

At Allstate Benefits ("AB"), we value you as a customer.  We also share your concerns about privacy. We are sending this notice to explain how we treat personal information ("customer information") that is not public.  This is information that we obtain from you or other sources when we provide you with products and services.

We want you to know that: we respect your privacy; and we protect your information.

---

- We do not sell customer information.
- We do not share your information with: persons; companies; or organizations outside of AB that would use that information to contact you about their products and services.
- We expect persons or organizations that provide services on our behalf to keep your information confidential.  We also expect them to use your information only to provide the services we've asked them to perform.
- We communicate to our employees about the need to protect your information.  We have established safeguards (these are physical, electronic and procedural) to protect this information.

---

Below are answers to questions that you might have about privacy. You may be wondering...

**What do we do with your information?**

AB does not sell your customer or medical information to anyone. We do not share it with companies or organizations outside of AB that would use that information to contact you about their own products and services. If this were to change, we would offer you the option to opt out of this type of information sharing.  Also, we would obtain your consent before we share medical information for marketing purposes.

Your agent or broker may use your information to help you with your insurance needs. We may also communicate with you about products, features, and options in which you have expressed an interest.   Without your consent, we may provide your information to persons or organizations in and out of AB.  This would be done as permitted or required by law.  We may do this to:

- Fulfill a transaction you have requested.
- Service your policy.
- Market our products to you.
- Investigate or handle claims.
- Detect or prevent fraud.
- Participate in insurance support organizations (Information from a report by an insurance support organization may be retained by that organization and distributed to other persons.).
- Comply with lawful requests from regulatory and law enforcement authorities.

These persons or organizations may include:

- Our affiliated companies.
- Companies that perform services, including marketing, on our behalf.
- Other financial institutions with which we have an agreement for the sale of financial products.
- Other insurance companies to perform their role in an insurance transaction involving you.
- Businesses that conduct actuarial or research studies.
- Persons requesting information pursuant to a subpoena or court order.
- Your agent or broker.
- An employer, if your premiums are payroll deducted.
- The creditor who sold you insurance, if your policy is credit insurance.

**EXHIBIT A-35**

1000055W312680202016082690WPL00757066

**What kind of customer information do we have, and where did we get it?**

Much of the information that we have about you comes from you. When you perform certain transactions, you may give us information such as your name, address, and Social Security number. These transactions include when you submit: an application for insurance; a request for insurance; a request for products and services we offer; or a request for an insurance quote. We may have contacted you by telephone or mail for additional information. We keep information about the types of services you purchase from us and our affiliates. Examples of this include premiums, fund values, and payment history. We may collect information from outside sources such as consumer reporting agencies and health care providers. The information we collect may include the following:

- Motor vehicle reports.
- Credit reports.
- Medical information.

**How do we protect your customer information?**

We expect any company with whom we share your information to use it only to provide the service we have asked them to perform. Information about you is also available within AB to those individuals who may need to use it to fulfill and service the needs of our customers. We communicate the need to protect your information to all employees and agents. We especially communicate this need to individuals who have access to it. Plus, we have established physical, electronic, and procedural safeguards to protect your information. Note that if your relationship with us ends, your information will remain protected. This protection will be provided according to our privacy practices outlined in this Important Notice.

**How can you find out what information we have about you?**

You may request to see, or obtain by mail, the information about you in our records. If you believe that our information is incomplete or inaccurate, you may request that we correct, add to, or delete from the disputed information. In order to fulfill your request, we may make arrangements to copy and disclose your information to you on our behalf. This may be done with an insurance support organization or a consumer reporting agency. You may also request a more complete description of the entities to which we disclose your information, or the conditions that might warrant such disclosures. Please send any of the requests listed above in writing to:

AB
Policyholder Services (Privacy Section)
1776 American Heritage Life Drive
Jacksonville, FL 32224-6687

**If you are an Internet user …**

Our website, www.allstatebenefits.com, provides information about AB, our products, and the agencies and brokers that represent us. You may also perform certain transactions on the website. When accessing www.allstatebenefits.com, please be sure to read the Privacy Statement that appears there. To learn more, the www.allstatebenefits.com Privacy Statement provides information relating to your use of the website. This includes, for example:

1) our use of online collecting devices known as "cookies";
2) how we collect information such as IP address (the number assigned to your computer when you use the Internet), browser and platform types, domain names, access times, referral data, and your activity while using our site;
3) who should use our website;
4) the security of information over the Internet;
5) links and co-branded sites.

We hope you have found this notice helpful. If you have any questions or would like more information, please don't hesitate to contact your agent or write us at:

AB
Policyholder Services (Privacy Section)
1776 American Heritage Life Drive
Jacksonville, FL 32224-6687

This notice is being provided on behalf of the following companies:

| | |
|---|---|
| American Heritage Life Insurance Company | Holiday Life Insurance Company |
| Bluegrass Life Insurance Company | Kentucky Home Mutual |
| Acme United Insurance Company | Keystone State Life |
| SMA Life Assurance Company | National Guardian Life |

EXHIBIT A-36

**If you have questions or concerns regarding your insurance policy/certificate, please contact us, our agent or other representative.**

**The address for American Heritage Life Insurance Company is:**
**1776 American Heritage Life Drive**
**Jacksonville, FL 32224**

**The phone number for customer service is:**
**1-800-521-3535**

**The California Department of Insurance should be contacted only if discussions with us, our agent or other representative, or both have failed to satisfactorily resolve a consumer problem.**

**The address and website of the Department's Consumer Services Division is:**
**300 S. Spring Street**
**Los Angeles, CA  90013**
**www.insurance.ca.gov**

**The phone number for callers inside the State of California is:**
**1-800-927-HELP**

**The phone number for callers outside the State of California is:**
**1-(213) 897-8921**



**CACN3**

## NOTICE OF PROTECTION PROVIDED BY
## CALIFORNIA LIFE AND HEALTH INSURANCE GUARANTEE ASSOCIATION

This notice provides a brief summary regarding the protections provided to policyholders by the California Life and Health Insurance Guarantee Association ("the Association"). The purpose of the Association is to assure that policyholders will be protected, within certain limits, in the unlikely event that a member insurer of the Association becomes financially unable to meet its obligations. Insurance companies licensed in California to sell life insurance, health insurance, annuities and structured settlement annuities are members of the Association. The protection provided by the Association is not unlimited and is not a substitute for consumers' care in selecting insurers. This protection was created under California law, which determines who and what is covered and the amounts of coverage.

Below is a brief summary of the coverages, exclusions and limits provided by the Association. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations or the rights or obligations of the Association.

### COVERAGE

**Persons Covered**

Generally, an individual is covered by the Association if the insurer was a member of the Association *and* the individual lives in California at the time the insurer is determined by a court to be insolvent. Coverage is also provided to policy beneficiaries, payees or assignees, whether or not they live in California.

**Amounts of Coverage**

The basic coverage protections provided by the Association are as follows:

- **Life Insurance, Annuities and Structured Settlement Annuities**

  For life insurance policies, annuities and structured settlement annuities, the Association will provide the following:

  - **Life Insurance**
    80% of death benefits but not to exceed $300,000
    80% of cash surrender or withdrawal values but not to exceed $100,000

  - **Annuities and Structured Settlement Annuities**
    80% of the present value of annuity benefits, including net cash withdrawal and net cash surrender values but not to exceed $250,000

  The maximum amount of protection provided by the Association to an individual, for *all* life insurance, annuities and structured settlement annuities is $300,000, regardless of the number of policies or contracts covering the individual.

- **Health Insurance**

  The maximum amount of protection provided by the Association to an individual, as of April 1, 2011, is $470,125. This amount will increase or decrease based upon changes in the health care cost component of the consumer price index to the date on which an insurer becomes an insolvent insurer.

CAGA

(12/11)

**EXHIBIT A-38**

## COVERAGE LIMITATIONS AND EXCLUSIONS FROM COVERAGE

The Association may not provide coverage for this policy.  Coverage by the Association generally requires residency in California.  You should not rely on coverage by the Association in selecting an insurance company or in selecting an insurance policy.

The following policies and persons are among those that are excluded from Association coverage:

- A policy or contract issued by an insurer that was not authorized to do business in California when it issued the policy or contract

- A policy issued by a health care service plan (HMO), a hospital or medical service organization, a charitable organization, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company, an insurance exchange, or a grants and annuities society

- If the person is provided coverage by the guaranty association of another state.

- Unallocated annuity contracts; that is, contracts which are not issued to and owned by an individual and which do not guaranty annuity benefits to an individual

- Employer and association plans, to the extent they are self-funded or uninsured

- A policy or contract providing any health care benefits under Medicare Part C or Part D

- An annuity issued by an organization that is only licensed to issue charitable gift annuities

- Any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as certain investment elements of a variable life insurance policy or a variable annuity contract

- Any policy of reinsurance unless an assumption certificate was issued

- Interest rate yields (including implied yields) that exceed limits that are specified in Insurance Code Section 1607.02(b)(2)(C).

## NOTICES

Insurance companies or their agents are required by law to give or send you this notice.  Policyholders with additional questions should first contact their insurer or agent.  To learn more about coverages provided by the Association, please visit the Association's website at www.califega.org, or contact either of the following:

California Life and Health Insurance  
Guarantee Association  
P.O. Box 16860  
Beverly Hills, CA  90209-3319  
(323) 782-0182

California Department of Insurance  
Consumer Communications Bureau  
300 South Spring Street  
Los Angeles, CA  90013  
(800) 927-4357

**Insurance companies and agents are not allowed by California law to use the existence of the Association or its coverage to solicit, induce or encourage you to purchase any form of insurance.  When selecting an insurance company, you should not rely on Association coverage.  If there is any inconsistency between this notice and California law, then California law will control.**

**EXHIBIT A-39**